AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
3/23/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:    DTA    DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
3/23/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:    KH    DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| ALONN ARMON WILLIS and DEMARRION MILES, | Case No.  8:22-mj-00223-DUTY |
| Defendants. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 16, 2022 in the county of Orange in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Interfere with Commerce by Robbery |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
Complainant's signature

Ryan Stearman, Special Agent, ATF
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      March 23, 2022          _____/s/ Autumn D. Spaeth_____
                                              Judge's signature

City and state:   Santa Ana, California      Hon. Autumn D. Spaeth, U.S. Magistrate Judge
                                                        Printed name and title

AUSA:  Benjamin Lichtman          (ext. 3530)

**AFFIDAVIT**

I, Ryan J. Stearman, being duly sworn, declare and state as follows:

**I.   INTRODUCTION**

1.   I am currently assigned to the ATF Los Angeles Field Division, Santa Ana Field Office, and have been employed by the ATF since September 2005.  In the course of my employment as an ATF Special Agent, I have conducted and assisted numerous investigations involving criminal street gangs, possession of firearms by prohibited persons, possession of stolen firearms, possession of machineguns, the illegal distribution of firearms, burglaries, robberies, and other violent crimes.  In particular, I have conducted numerous serial robbery investigations involving a suspect or suspects committing multiple robberies, most of which were armed, of various businesses over a short period of time.  Additionally, I have investigated several commercial and residential burglaries in the course of my duties.

2.   As part of my current assignment, I work on the ATF Orange County Violent Crime Task Force ("OCVCTF"), which is comprised of federal and local law enforcement investigators focusing primarily on violent crimes and firearm offenses.  As a lead senior investigator on the OCVCTF, I routinely work with various law enforcement agencies in Southern California, and often across the United States, in reviewing and investigating criminal patterns and identifying crimes that are related to each other, specifically robberies.  Since 2016, I have investigated hundreds of robberies, most of which were committed by armed suspects.  Additionally, I have investigated or assisted in the investigation of over 100 burglaries.

1

3.    To successfully conduct these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, wire interceptions, cellular telephone analysis, interviews, the utilization of undercover agents and informants, and the review of various databases and records.  I have interviewed numerous suspects who have committed robberies and burglaries, among other crimes, and have become familiar with the methods and means by which they commit crime and attempt to avoid law enforcement detection.  I have also interviewed witnesses and victims of crimes and participated in in-field lineups and presentations of six-pack photo arrays for suspect identification purposes.

4.    I have received training during the course of my employment as an ATF Special Agent in various topics to include but not limited to: robberies affecting interstate commerce, interview techniques, illegal trafficking of firearms, the utilization of informants, the activities of criminal street gangs, asset forfeiture, and conducting surveillance and wire interceptions.  Through these investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by individuals to plan and commit robberies, to smuggle, safeguard, and store firearms, to distribute firearms, and to collect and launder related, illicit proceeds.

5.    In the course of my investigations, I routinely utilize cellular technology and records, including cell phone pings, cell site simulators, forensic imaging of seized digital devices, call detail records with and without cell site location information, tower logs, and account history information.  Just in the last five years, I have reviewed and analyzed hundreds of thousands of call detail

records during various investigations.  I regularly obtain and analyze these records and data in the course of my investigations to establish patterns and obtain evidence of the crimes in which I am investigating since almost every person utilizes a cellular telephone during this day and age, and these devices often contain and transmit a wealth of information about a person's activities and communications related to criminal activity.

6.    As an ATF Special Agent, I have also participated in numerous federal and state search and arrest warrants involving individuals engaged in conspiracies to commit robberies and burglaries, unlawfully trafficking firearms, stealing firearms, unlawfully possessing firearms, as well as other criminal activity, including controlled substance offenses.  Additionally, I have participated in the collection and seizure of hundreds of cellular telephone records, firearms records, and other types of evidence that documents activities in furtherance of robbery conspiracies, firearms crimes, and controlled substance offenses.

## II. <u>PURPOSE OF AFFIDAVIT</u>

7.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, ALONN ARMON WILLIS ("WILLIS") and DEMARRION MILES ("MILES"), charging them with conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a).

8.    This affidavit is also made in support of an application for warrants to search three black Apple iPhones, as described more fully below and in Attachments A-1, A-2, and A-3, which are incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1951(a), as described

more fully in Attachment B, which is also incorporated herein by reference (the "SUBJECT OFFENSE").

9. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. DIGITAL DEVICES TO BE SEARCHED

10. The digital devices to be searched are:

a. A black Apple iPhone seized from MILES in the custody of the Santa Ana Police Department under package number 22-03726 ("SUBJECT DEVICE 1"), as further described in Attachment A-1, which is incorporated fully herein by reference;

b. A black Apple iPhone seized from WILLIS in the custody of the Santa Ana Police Department under package number 22-03704 ("SUBJECT DEVICE 2"), as further described in Attachment A-2, which is incorporated fully herein by reference; and

c. A black Apple iPhone in the custody of the Santa Ana Police Department under package number 22-03710 ("SUBJECT DEVICE 3"), which was seized from an additional suspect in this investigation, as further described in Attachment A-3, which is

incorporated fully herein by reference (collectively the
"SUBJECT DEVICES").

    11.  The list of items to be seized, which are evidence,
fruits, and instrumentalities of the SUBJECT OFFENSE, is set
forth in Attachment B, which is also incorporated herein by
reference.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

    12. ATF is investigating a robbery of a CVS pharmacy in Santa
Ana, California that occurred on the evening of March 16, 2022.  The
robbery was committed by four men and was captured on CVS
surveillance footage and witnessed by multiple individuals who were
present in the CVS pharmacy at the time.  One of the witnesses
provided police with a description of the suspects' getaway vehicle,
which was encountered by police shortly after the robbery. As set
forth below, the following evidence connects WILLIS and MILES to
this robbery: (1) clothing worn by WILLIS and MILES during the
robbery, which is consistent with items of clothing recovered by law
enforcement from the persons of WILLIS and MILES at the time of
their arrests; (2) when they were encountered by police shortly
after the robbery, WILLIS and MILES fled from the vehicle that was
used as a getaway vehicle during the robbery; (3) the getaway
vehicle is registered to a family member of WILLIS; and (4) stolen
merchandise from the robbery was located in the getaway vehicle
shortly after the robbery.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13.  I am the lead ATF agent assigned to the investigation of this CVS pharmacy[1] robbery in Santa Ana, as well as additional thefts and robberies of CVS pharmacies that have occurred in the last 30 days in Orange and Los Angeles Counties.  During the course of the investigation, I have obtained and reviewed local police reports related to the robberies, reviewed surveillance footage and still images from the robberies, reviewed police body-worn camera footage, and discussed the robberies with other involved law enforcement investigators, among other investigative activity.

### A.   March 16, 2022 Robbery

14. Based on my review of police reports and CVS surveillance footage, I know that on March 16, 2022, at approximately 8:45 p.m., a robbery occurred at the CVS Pharmacy located at 1545 West 17th Street, Santa Ana, California (the "CVS store").  Four suspects arrived in a silver four-door sedan (the "suspect vehicle")[2], which they parked in front of the store on the red curb with the sedan's hazard lights activated.

15. The four suspects were black males wearing blue latex gloves, face masks, and hooded sweatshirts with the hoods pulled up over their heads.

---

[1] CVS Pharmacy, Inc. is an American retailer and subsidiary of CVS Health operating thousands of pharmacies, in addition to online retail business, across the United States in more than 47 states.  As such, this corporation conducts interstate transactions and transportation of money and products.

[2] The sedan was consistent with a Ford Taurus.

16. Based on my review of surveillance footage, I know that the suspects were wearing the following clothing:

       i.   Suspect 1 (later identified as WILLIS):  A dark blue zip-up, hooded sweatshirt with a small white emblem on the right chest area, dark blue sweatpants, and gray Nike shoes.

       ii.  Suspect 2 (later identified as MILES):  A black hooded sweatshirt with a white emblem on the left chest area, gray sweatpants, white tennis shoes, dark socks, and a black ski mask. This suspect was carrying a unique, multi-colored "Rick and Morty"[3] backpack.

       iii. Suspect 3:  A black, yellow, and red hooded sweatshirt, tan pants, dark tennis shoes, and black face mask.

       iv.  Suspect 4:  A black hooded Nike sweatshirt with a Nike emblem on the left chest, with a white t-shirt underneath, black sweatpants, purple tennis shoes, and a black face mask.  This suspect was carrying a red and white colored backpack with "$1,000,000" printed in large red numbers on the front.

17. Based on my review of police reports and surveillance footage, I know that the suspects walked into the CVS store and headed directly to the pharmacy, where all suspects climbed over the counter and one yelled a statement to the effect of "Nobody move or I'll shoot you."  The suspects then proceeded to steal prescription medications from the pharmacy.

_____

[3] "Rick and Morty" is an American adult animated science fiction sitcom on the cable television channel Cartoon Network.

18. During the robbery, one of the suspects demanded that the pharmacist open the safe, while telling the pharmacist to "hurry up."  Another employee recalled the suspects saying "First person who moves will get shot" and "this bitch is getting robbed, no one move or they're gonna get shot," while also asking for specific controlled narcotics like Percocet and Codeine.

19. During the robbery, Suspect 2 filled the Rick and Morty backpack with medications and handed it to Suspect 1, who left the store first.  The other backpack, carried by Suspect 4, was also used to steal medication from the pharmacy.

20. The suspects stole a cash register drawer from the CVS store containing approximately $467 as well as various medications valued between approximately $200 to $300.

21. As the suspects fled the store, a witness observed the suspects run to the silver sedan that was parked by the curb. Suspect 1 ran to the vehicle before the others and entered the driver's seat, drove the vehicle a short distance in the parking lot, and then waited for the remaining three suspects to enter the vehicle as they fled the CVS store.

22. As this was occurring, a witness was reporting the robbery to police on the phone.  The witness provided police with a description of the vehicle, including the California license plate 8ZDT707, before the suspect vehicle left the store parking lot.

**B.   Arrest of MILES and WILLIS**

23. As police were responding to the area based on the report of the robbery, a Santa Ana Police Department ("SAPD") officer located the suspect vehicle within minutes of the call and began to follow it.  The officer continued to follow the vehicle without activating his emergency lights or siren.  After driving half a mile toward the freeway, the suspect vehicle began to drive erratically on Santa Clara Avenue near Main Street in Santa Ana, where it almost collided with another vehicle as it headed towards Interstate 5.  At this point, the SAPD officer activated his emergency lights and siren.

24. The suspect vehicle then accelerated onto the freeway from Main Street, traveling at speeds in excess of 100 miles per hour, and weaving in and out of traffic.  The suspect vehicle almost collided with other motorists on the freeway several times.

25. In the area of the Euclid Avenue exit on Interstate 5 (in the city of Anaheim), the front seat passenger in the suspect vehicle threw a black case, which appeared to be part of a cash register, out of the vehicle.[4]

26. As the suspect vehicle approached Magnolia Street on Interstate 5 (in Orange County), it exited at a high rate of speed and lost control, causing the suspect vehicle to crash and roll

---

[4] California Highway Patrol Officers were able to recover the black case thrown from the suspect vehicle during the pursuit. It is believed to be a component of the cash register stolen from the CVS store.

over.  Within moments of the crash, the four suspects began to crawl from the vehicle and run despite the pursuing officers giving commands to stop.

27. The SAPD officer saw MILES, and the other three suspects emerge from the suspect vehicle and run away.

28. MILES emerged from the suspect vehicle carrying the red and white "$1,000,000" backpack.  As the officer pursued MILES on foot a short distance, the officer observed MILES drop the backpack just before the officer apprehended MILES and arrested him.

29. A search of the red and white backpack incident to the arrest of MILES revealed that the backpack contained some of the medication suspected of being stolen from the CVS pharmacy, as well as SUBJECT DEVICE 1 and a loaded Tanfoglio, Witness model, .45 caliber pistol bearing serial number AE78092.[5]

30. Initially, MILES provided a false name to officers, but MILES's true identity was later determined that evening by SAPD Detective David Prewett, who utilized law enforcement databases. Later, MILES stated to Detective Prewett that his (MILES's) first name was "Demarrion."

31. Officers with SAPD and other Orange County law enforcement agencies responded to the area of the crash and established a containment of the area in order to search for the three other suspects who fled from the suspect vehicle.  Within a minute or two,

_____

[5] This firearm was reported to the Los Angeles Police Department as being stolen during a residential burglary in December 2021.

WILLIS and co-conspirator 1 ("CC-1"; previously referred to as Suspect 3)[6] were apprehended separately within 500 feet of the crash site.

32. Next to WILLIS at the time he was arrested was the Rick and Morty backpack.  A search of this backpack revealed that it contained vehicle registration for the suspect vehicle, which was a Ford Taurus,[7] as well as several medications suspected of being stolen from the CVS pharmacy.  SUBJECT DEVICE 2 was also recovered next to WILLIS at the time of his arrest.

33. Based on my review of police reports and surveillance footage, I know the following:

    a.   WILLIS was arrested wearing the same clothing as Suspect 1, described above.

    b.   MILES was arrested wearing the same clothing as Suspect 2, described above.

    c.   CC-1 was arrested wearing the same exact clothing as Suspect 3 described above.  SUBJECT DEVICE 3 was located in CC-1's front pant pocket incident to arrest.

34. A photojournalist who was attempting to document the police pursuit advised the arresting officers that the photojournalist observed WILLIS with the backpack before he was apprehended.

---

[6] CC-1 was identified by law enforcement as a 17-year old male from Los Angeles, California.

[7] The vehicle is registered to Anthony Dwayne Willis at an address in Torrance, California, which is the same address used by WILLIS.

35. Despite a lengthy search, co-conspirator 2 ("CC-2"; previously referred to as Suspect 4) was not located and remains at large.

### C.   Interview of WILLIS

36. On March 17, 2022, WILLIS waived his <u>Miranda</u> rights and was interviewed by Detective Prewett at the SAPD jail.  During the interview, Detective Prewett confronted WILLIS with the fact that there is video surveillance footage of WILLIS and the others stealing medication and money from the CVS store.  WILLIS responded that they did not get the money out of the register drawer and ended up throwing the drawer out of the vehicle on the freeway.  WILLIS explained that the only way to access the money from the register drawer was to "crack that first, and we were never able to get out to crack that … that register got thrown out.  It's not in the car no more.  It got thrown out in the high speed [chase] on the freeway."

### D.   CVS Orange Theft

37. Based on my review of police reports, I know that on March 16, 2022, approximately 15 minutes before the robbery of the CVS store in Santa Ana described above, a theft occurred at the CVS pharmacy located at 480 South Main Street in Orange, California.  During this incident, six individuals entered the CVS in Orange and stole approximately $10,000 worth of medication.  Four of the six suspects were dressed the same as the four suspects involved in the aforementioned Santa Ana robbery.  Two vehicles were involved in the Orange incident, one of which was the same Ford Taurus from the Santa Ana robbery.

38. A search of the suspect vehicle by SAPD officers following the police pursuit described above revealed several prescription medications from the CVS in Orange.

### E.    Training and Experience Concerning Digital Devices

39. In my training and experience, individuals who commit robberies, burglaries, and thefts will use cellular telephones to communicate with co-conspirators to plan and organize their crimes. Additionally, suspects will use cell phones to research their intended victims.  A search of the devices can often provide data showing searches conducted relevant to the investigation.  In addition to call logs and text messages that are contained in the devices and are relevant to the investigation of the crime, the devices often times contain digital images relevant to the investigation to include but not limited to:  proceeds taken from the crime, additional suspects, firearms, and suspects wearing clothing used in the crime(s).  Additionally, a search of the devices will often yield additional phone numbers, email, and social media accounts used by the suspects that may also contain evidence of the crimes.

//

//

//

## V.  <u>CONCLUSION</u>

16.   For all the reasons described above, there is probable cause to believe that MILES and WILLIS have violated 18 U.S.C. § 1951(a) (conspiracy to interfere with commerce by robbery). Additionally, there is probable cause to believe that items to be seized as described in Attachment B of this affidavit, will be found in a search of the SUBJECT DEVICES, as described above and in Attachments A-1 through A-3 of this affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 23rd day of
March, 2022.


_____ /s/ Autumn D. Spaeth _____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

14

**ATTACHMENT A-1**

<u>DEVICE TO BE SEARCHED</u>

The digital device to be searched is a black Apple iPhone, seized from MILES ("SUBJECT DEVICE 1"), currently in the custody of the Santa Ana Police Department under package number 22-03726.

**ATTACHMENT A-2**

<u>DEVICE TO BE SEARCHED</u>

The digital device to be searched is a black Apple iPhone, seized from WILLIS ("SUBJECT DEVICE 2"), currently in the custody of the Santa Ana Police Department under package number 22-03704.

**ATTACHMENT A-3**

<u>DEVICE TO BE SEARCHED</u>

The digital device to be searched is a black Apple iPhone, seized from CC-1 ("SUBJECT DEVICE 3"), currently in the custody of the Santa Ana Police Department under package number 22-03710.

## ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1951(a) (conspiracy to interfere with commerce by robbery), namely:

        a.    photographs of United States currency

        b.    Records, items, photographs, video recordings, communications, receipts, internet searches, or location data related to CVS, or any other pharmacy.

        c.    Records, photographs, video recordings, communications, internet searches, or location data related to robberies, planning robberies, or the proceeds of robberies.

        d.    All photographs, records, communications, and internet searches regarding firearms or replica firearms.

        e.    Location data for the month of March 2022.

        f.    Bank or other financial records related to cash deposits.

        g.    Any images, pictures, or videos of WILLIS, MILES, or CC-1.

2.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

3.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    passwords, encryption keys, and other access devices that may be necessary to access the device;

g.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.    records of or information about Internet Protocol addresses used by the device;

i.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

SEARCH PROCEDURE FOR DIGITAL DEVICES

5.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrantwill employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list ofitems to be seized. The search team may also search for and

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

     c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

     d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

     e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

     f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data

fallingwithin the list of other items to be seized, the government may retain the digital device and any forensic copies of the digitaldevice, but may not access data falling outside the scope of theother items to be seized (after the time for searching the device has expired) absent further court order.

       g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

       i.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

          i.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

ii.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digitaldata;

iii. Any magnetic, electronic, or optical storagedevice capable of storing digital data;

iv.  Any documentation, operating logs, or reference manuals regarding the operation of the digital deviceor software used in the digital device;

v.  Any applications, utility programs, compilers, interpreters, or other software used to facilitatedirect or indirect communication with the digital device;

vi.  Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gainaccess to the digital device or data stored on the digital device; and

vii. Any passwords, password files, biometrickeys, test keys, encryption codes, or other information necessary to access the digital device or data stored on thedigital device.

j.  During the execution of this search warrant, lawenforcement is permitted to: (1) depress WILLIS' and MILES' fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of WILLIS' and MILES' face with his or her eyes open to activate the facial-,iris-, or

1

retina-recognition feature, in order to gain access tothe
contents of any such device.  In depressing a person's thumb
or finger onto a device and in holding a device in front of
a person's face, law enforcement may not use excessive
force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989);
specifically,law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    7.    The special procedures relating to digital
devices found in this warrant govern only the search of
digital devicespursuant to the authority conferred by this
warrant and do notapply to any search of digital devices
pursuant to any other court order.